WESTON & AGNESS LLP
Leo L. Ashley III (State Bar No. 197890)
Shadie Maghareh (State Bar No. 323670)
1960 East Grand Avenue, Suite 811
El Segundo, California 90245
Telephone: (213) 596-8000
Facsimile: (213) 596-8039
Email: lashley@westonagnesslaw.com
smaghareh@westonagnesslaw.com

Attorneys for Defendant AMGUARD INSURANCE COMPANY

**UNITED STATES DISTRICT COURT**

**FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| HAMDI ABDEL MUNIM ABU KHALAF, an individual; and ALADDIN CLAIREMONT & MKT, INC., DBA ALADDIN'S CAFE, a California Corporation;<br><br>Plaintiffs,<br><br>v.<br><br>BERKSHIRE HATHAWAY ASSURANCE CORPORATION, a New York Corporation; BERKSHIRE HATHAWAY GUARD INSURANCE COMPANIES, a Pennsylvania Corporation; BERKSHIRE HATHAWAY INC., a California Corporation; AMGUARD INSURANCE COMPANY, a Pennsylvania Corporation; and DOES 1 through 50, inclusive,<br><br>Defendants. | Case No. 3:25-cv-02246-H-JLB<br>Assigned to Hon. Marilyn L. Huff<br><br>**DEFENDANT AMGUARD INSURANCE COMPANY'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>[Filed concurrently with the Declaration of Darren Heiser, Declaration of Shadie Maghareh, Separate Statement of Material Facts, and Request for Judicial Notice]<br><br>Date: December 14, 2026<br>Time: 10:30 a.m.<br>Courtroom: 12A<br><br>Action Filed: July 8, 2025<br>Action Removed: August 28, 2025<br>Trial Date: TBD |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE THAT on December 14, 2026 at 10:30 a.m. or as soon thereafter as the matter may be heard, in Courtroom 12A of the James M. Carter & Judith N. Keep Courthouse located at 333 West Broadway, San Diego, California 92101, Defendant AmGUARD Insurance Company ("AmGUARD")

will and hereby does move this Court pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Rule 56") for summary judgment in its favor and against Plaintiffs Hamdi Abdel Munim Abu Khalaf ("Khalaf") and Aladdin Clairemont & Mkt, Inc., dba Aladdin's Cafe ("Aladdin") (collectively, "Plaintiffs") on the grounds that there is no genuine dispute as to any material fact and AmGUARD is entitled to judgment as a matter of law. In particular, Plaintiffs cannot prove their claims for breach of contract and breach of the covenant of good faith and fair dealing ("bad faith") against AmGUARD because: (1) this suit involves a loss at Plaintiffs' leased business premises located at 5420 Clairemont Mesa Boulevard, San Diego, CA 92117 ("Property") in which rain from Tropical Storm Hilary entered the Property through the roof on or about August 20, 2023 and damaged the interior of the Property ("Loss"); (2) the evidentiary record inclusive of opinions by the parties' retained experts discloses three potential causes of the Loss – (i) rain that entered the Property through means other than damage to the exterior of the Property caused by the storm, (ii) deteriorated roofing sealants and underlayment and (iii) obstruction of drainage through the lone roof drain by wind-blown leaves, vegetation and debris; and (3) the subject insurance policy issued by AmGUARD to Aladdin ("Policy") precludes coverage for all three of those causes, except that the Policy provides limited coverage for loss due to water that backs up from or overflows the roof drain totaling $10,000 which has already been paid by AmGUARD.

PLEASE TAKE FURTHER NOTICE that in the alternative, and only in the event that the motion for summary judgment is denied, AmGUARD will and hereby does move this Court pursuant to Rule 56 for partial summary judgment as to the following causes of action and claims for damages for the following reasons:

1. AmGUARD is entitled to partial summary judgment as a matter of law on Plaintiffs' First Cause of Action for Breach of Contract because the Policy precludes coverage for the Loss, and even if it does not,

AmGUARD has paid all benefits due under the Policy;

2. AmGUARD is entitled to partial summary judgment as a matter of law on Plaintiffs' Second Cause of Action for Bad Faith because AmGUARD did not breach the Policy, there is no evidence that AmGUARD unreasonably withheld Policy benefits and there is at least a genuine dispute as to whether the Policy precludes coverage for the Loss;

3. AmGUARD is entitled to partial summary judgment as a matter of law on Plaintiffs' claim for punitive damages because there is no clear and convincing evidence that AmGUARD acted with malice, oppression, or fraud;

4. AmGUARD is entitled to partial summary judgment on Khalaf's First Cause of Action for Breach of Contract because he lacks standing;

5. AmGUARD is entitled to partial summary judgment on Khalaf's Second Cause of Action for Bad Faith because he lacks standing;

6. AmGUARD is entitled to partial summary judgment on Plaintiffs' damages claim for roof repairs to the Property totaling $104,450 because the Policy does not provide coverage for loss of or damage to the roof and AmGUARD has paid any and all Policy benefits that could possibly be due as a result of the Loss;

7. AmGUARD is entitled to partial summary judgment on Plaintiffs' damages claim for costs to demolish portions of the Property totaling $138,025 because the Policy precludes coverage for the Loss, and even if it does not, AmGUARD has paid all benefits due under the Policy;

8. AmGUARD is entitled to partial summary judgment on Plaintiffs' damages claim for plumbing repairs at the Property totaling $68,320 because the Policy precludes coverage for the Loss, and even if it does not, AmGUARD has paid all benefits due under the Policy;

9. AmGUARD is entitled to partial summary judgment on Plaintiffs' damages claim for electric repairs at the Property totaling $84,000 because the Policy precludes coverage for the Loss, and even if it does not, AmGUARD has paid all benefits due under the Policy;
10. AmGUARD is entitled to partial summary judgment on Plaintiffs' damages claim for mechanical repairs at the Property totaling $96,280 because the Policy precludes coverage for the Loss, and even if it does not, AmGUARD has paid all benefits due under the Policy;
11. AmGUARD is entitled to partial summary judgment on Plaintiffs' damages claim for flooring and baseboard repairs at the Property totaling $67,210 because the Policy precludes coverage for the Loss, and even if it does not, AmGUARD has paid all benefits due under the Policy;
12. AmGUARD is entitled to partial summary judgment on Plaintiffs' damages claim for drywall and T-bar repairs at the Property totaling $209,560 because the Policy precludes coverage for the Loss, and even if it does not, AmGUARD has paid all benefits due under the Policy;
13. AmGUARD is entitled to partial summary judgment on Plaintiffs' damages claim for furniture and equipment related repair work at the Property totaling $46,000 because the Policy precludes coverage for the Loss, and even if it does not, AmGUARD has paid all benefits due under the Policy;
14. AmGUARD is entitled to partial summary judgment on Plaintiffs' damages claim for rental costs related to repair work at the Property totaling $20,800 because the Policy precludes coverage for the Loss, and even if it does not, AmGUARD has paid all benefits due under the Policy;
15. AmGUARD is entitled to partial summary judgment on Plaintiffs' damages claim for plans, permits and special inspections related to repair

work at the Property totaling $56,000 because the Policy precludes coverage for the Loss, and even if it does not, AmGUARD has paid all benefits due under the Policy;

16. AmGUARD is entitled to partial summary judgment on Plaintiffs' damages claim for overhead and insurance related to repair work at the Property totaling $71,251.60 because the Policy precludes coverage for the Loss, and even if it does not, AmGUARD has paid all benefits due under the Policy;

17. AmGUARD is entitled to partial summary judgment on Plaintiffs' damages claim for profit related to repair work at the Property totaling $178,129 because the Policy precludes coverage for the Loss, and even if it does not, AmGUARD has paid all benefits due under the Policy; and

18. AmGUARD is entitled to partial summary judgment on Plaintiffs' damages claim for loss of business income in May 2025 and April 2026 totaling $89,720 or any other amount because any such loss was not sustained within twelve consecutive months after the Loss.

This Motion is based upon this Notice of Motion, the accompanying Memorandum of Points and Authorities, the Declaration of Darren Heiser and Exhibits 1-12 attached thereto, the Declaration of Shadie Maghareh and Exhibits 13-19 attached thereto, the Separate Statement of Material Facts, the Request for Judicial Notice and Exhibits 20-21 attached thereto, the complete files and records in this action, and all matters of which this Court may properly take judicial notice.

Dated: October 22, 2026

Respectfully submitted,
WESTON & AGNESS LLP

By: **/s/ Shadie Maghareh**
Leo L. Ashley III
Shadie Maghareh
Attorneys for Defendant
AMGUARD INSURANCE COMPANY

# TABLE OF CONTENTS


I. INTRODUCTION .......... 11

II. FACTUAL BACKGROUND .......... 14

A. THE POLICY .......... 14

1. Limitations And Exclusions .......... 14

2. Back Up/Overflow Endorsement .......... 15

B. PLAINTIFFS AND THE PROPERTY .......... 15

C. THE FEBRUARY LOSS .......... 16

D. THE AUGUST LOSS AND AMGUARD'S INVESTIGATION .......... 16

E. THIS ACTION & DAMAGES CLAIMED BY PLAINTIFFS .......... 21

F. EVIDENCE REGARDING THE CAUSE(S) OF LOSS .......... 21

III. SUMMARY JUDGMENT IS WARRANTED IN AMGUARD'S FAVOR .......... 22

A. LEGAL STANDARD .......... 22

B. PLAINTIFFS' BREACH OF CONTRACT CLAIM FAILS .......... 23

1. The Loss is Not Covered Because the Building Did Not First Sustain Damage by a Covered Cause of Loss .......... 25

2. The Loss is Not Covered Due to the Deterioration, Wear and Tear, and/or Faulty Maintenance Exclusions .......... 26

3. At Most, Coverage For The Loss Is Capped at $10,000, Which AmGUARD Has Already Paid .......... 27

C. PLAINTIFFS' BAD FAITH CLAIM FAILS .......... 28

1. Without Coverage There Can Be No Bad Faith .......... 28

2. Plaintiffs Cannot Show AmGUARD Acted in Bad Faith .......... 28

D. PLAINTIFFS' PUNITIVE DAMAGES CLAIM FAILS .......... 31

E. AMGUARD IS ENTITLED TO PARTIAL SUMMARY JUDGMENT AS TO OTHER ISSUES IF SUMMARY JUDGMENT IS NOT GRANTED .......... 33

1. Khalaf Lacks Standing to Sue on the Policy .......... 33

2. Plaintiffs Cannot Recover Business Income

Loss Sustained More Than Twelve Months After the Date of Loss ..... 34

3. Plaintiffs Are Not Entitled to Policy Benefits for Installation of a New Roof at the Property ..... 34

4. The Policy Does Not Cover Costs To Repair The Interior Of The Property ..... 35

IV. CONCLUSION ..... 35

## TABLE OF AUTHORITIES

**Federal Cases**

Adams v. Allstate Ins. Co.
187 F. Supp. 2d 1219 (C.D. Cal. 2002) ..... 32

Anacapa Marine St., LLC v. Travelers Cas. Ins. Co. of Am.
834 F. Supp. 3d 869 (C.D. Cal. 2026) ..... 24

Anderson v. Liberty Lobby, Inc.
477 U.S. 242 (1986) ..... 22

Berry v. Commercial Union Ins. Co.
87 F.3d 387 (9th Cir. 1996) ..... 24

Blue Ridge Ins. Co. v. Stanewich
142 F. 3d 1145 (9th Cir. 1998) ..... 22

Casey v. Metropolitan Life Ins. Co.
688 F. Supp. 2d 1086 (E.D. Cal. 2010) ..... 32

Celotex Corp. v. Catrett
477 U.S. 317 (1986) ..... 22, 23

Homestead Ins. Co. v. Ryness Co.
851 F. Supp. 1441 (N.D. Cal. 1992) ..... 22

Ives v. Allstate Ins. Co.
520 F. Supp. 3d 1248 (C.D. Cal. 2021) ..... 28

Loughney v. Allstate Ins. Co.
465 F. Supp. 2d 1039 (S.D. Cal. 2006) ..... 24

Lunsford v. Am. Guar. & Liab. Ins. Co.
18 F.3d 653 (9th Cir. 1994) ..... 32

Meridian Leasing, Inc. v. Associated Aviation Underwriters, Inc.
409 F.3d 342 (6th Cir. 2005) ..... 26

S. Cal. Gas Co. v. City of Santa Ana
336 F.3d 885 (9th Cir. 2003) ..... 23

SDR Capital Mgmt., Inc. v. Am. Int'l Specialty Lines Ins. Co.
320 F. Supp. 2d 1043 (S.D. Cal. 2004) ..... 23

T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n
809 F.2d 626 (9th Cir. 1987) ..... 23

Udinsky v. State Farm Fire & Cas. Co.
No. 18-CV-03994-JSC, 2019 WL 1017606 (N.D. Cal. Mar. 4, 2019) ..... 30

Victoria Fam. Ltd. Liab. Ltd. P'ship v. Ohio Sec. Ins. Co.
475 F. Supp. 3d 1106 (S.D. Cal. 2020) ..... 24

**State Cases**

Aetna Cas. & Sur. Co. v. Richmond
76 Cal. App. 3d 645 (1977)....30

Brodkin v. State Farm Fire & Cas. Co.
217 Cal. App. 3d 210 (1989)....24, 26

Cal. Shoppers, Inc. v. Royal Globe Ins. Co.
175 Cal. App. 3d 1 (1985)....28

Cal. State Auto. Ass'n Inter-Ins. Bureau v. Superior Court
184 Cal. App. 3d 1428 (1986)....28

Cardio Diagnostic Imaging, Inc. v. Farmers Ins. Exch.
212 Cal. App. 4th 69 (2012)....27

Chateau Chamberay Homeowners Ass'n v. Associated Int'l Ins. Co.
90 Cal. App. 4th 335 (2001)....28, 29

Delgado v. Heritage Life Ins. Co.
157 Cal. App. 3d 262 (1984)....31

Diep v. Cal. Fair Plan Ass'n
15 Cal. App. 4th 1205 (1993)....25

Fraley v. Allstate Ins. Co.
81 Cal. App. 4th 1282 (2000)....29

Garvey v. State Farm Fire & Cas. Co.
48 Cal. 3d 395 (1989)....24

Hatchwell v. Blue Shield of Cal.
198 Cal. App. 3d 1027 (1988)....33

Janney v. CSAA Ins. Exch.
70 Cal. App. 5th 374 (2021)....28

Jordan v. Allstate Ins. Co.
148 Cal. App. 4th 1062 (Ct. App. 2007)....28

Manneck v. Lawyers Title Ins. Corp.
28 Cal. App. 4th 1294 (1994)....30

Mason v. Mercury Cas. Co.
64 Cal. App. 3d 471 (1976)....32

Miller v. Elite Ins. Co.
100 Cal. App. 3d 739 (1980)....30

Mock v. Michigan Millers Mut. Ins. Co.
4 Cal. App. 4th 306 (1992)....32

Opsal v. United Servs Auto. Ass'n
2 Cal. App. 4th 1197 (1991)....29

Reichert v. Gen. Ins. Co. of Am.
68 Cal. 2d 822 (1968)....23

San Diego Hous. Comm'n v. Indus. Indem. Co.
68 Cal. App. 4th 526 (1998)....23

San Jose Crane & Rigging, Inc. v. Lexington Ins. Co.
227 Cal. App. 3d 1314 (1991)....24

Tomaselli v. Transamerica Ins. Co.
25 Cal. App. 4th 1269 (1994)....32

Waldsmith v. State Farm Fire & Cas. Co.
232 Cal. App. 3d 693 (1991)....26

Waller v. Truck Ins. Exch. Inc.
11 Cal. 4th 1 (1995)....23, 28, 34

Weil v. Federal Kemper Life Assurance Co.
7 Cal. 4th 125 (1994)....24

**Federal Statutes**

Federal Rules of Civil Procedure, Rule 56(a) ....22

**State Statutes**

California Civil Code, Section 3294....31

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

This action involves a dispute about insurance coverage. Plaintiff Aladdin Clairemont & Mkt, Inc. dba Aladdin's Cafe ("Aladdin") leases the building at 5420 Clairemont Mesa Blvd., San Diego, CA 92117 ("Property") and operates the premises as a Mediterranean restaurant. The interior of the Property sustained damage on or about August 20, 2023 due to the entry of storm water from Tropical Storm Hilary ("Hilary") through the roof of the Property ("Loss").

Defendant AmGUARD Insurance Company ("AmGUARD") issued a businessowners insurance policy to Aladdin that was in effect at the time of the Loss ("Policy"). The Policy precludes coverage for rain damage to the interior of a building "unless …[T]he building or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain enters…" ("Interior Damage Limitation"). The Policy also excludes coverage for loss of or damage to property caused by "[R]ust or other corrosion, decay, deterioration…" ("Deterioration Exclusion"), "[W]ear and tear…" ("Wear and Tear Exclusion"), and "[F]aulty, inadequate or defective…[M]aintenance of part or all of any property on or off the described premises…" ("Faulty Maintenance Exclusion").

Before the roof of the Property was inspected to determine how water entered the interior of the premises, AmGUARD acknowledged Policy coverage for the Loss and issued a payment to Aladdin totaling $24,829 for damage to ceiling tiles and grids inside the Property. AmGUARD subsequently engaged engineering firm Keystone Experts and Engineers, LLC ("Keystone") to inspect the roof and determine how storm water entered the Property. Keystone's inspection revealed (1) the roof and exterior elements were not damaged or displaced by wind, and (2) damage to the interior finishes was caused by a combination of (a) long-term water intrusion through existing openings including deteriorated sealant around roof penetrations, deteriorated sealant on mechanical curbs, deteriorated sealant on

parapet walls and deteriorated underlayment ("Deteriorated Roof Conditions") and (b) heavy rainfall during the one-time storm event that backed up on the roof and overflowed into a roof vent with a rim that was approximately 2 inches above the roof surface.

AmGUARD denied coverage for the Loss based on Keystone's expert engineering analysis of, and conclusions about, the cause(s) of Loss and terms of the Policy, including the Interior Damage Limitation and Deterioration, Wear and Tear and Faulty Maintenance Exclusions. Aladdin and its principal Plaintiff Hamdi Abdel Munim Abu Khalaf ("Khalaf") claim the denial was wrongful. They allege claims against AmGUARD for breach of contract and breach of the covenant of good faith and fair dealing ("bad faith"), and seek damages in excess of $1.1 million for costs to repair the Property due to the Loss, damages for lost business income sustained in May 2025 and April 2026 while the restaurant was closed for repairs totaling $89,720 and punitive damages.

Neither cause of action is viable. Indeed, Plaintiffs' own retained experts confirm the very facts underlying AmGUARD's coverage determination, specifically Hilary did not damage the roof or exterior of the Property or otherwise create an opening through which rain entered the premises, storm water entered the Property through the roof vent and the Deteriorated Roof Conditions also contributed to storm water intrusion into the Property. AmGUARD correctly denied coverage for the Loss, and did not breach the Policy, because the Interior Damage Limitation, Deterioration Exclusion, Wear and Tear Exclusion and/or Faulty Maintenance Exclusion preclude coverage for such damage to the interior of the Property.

AmGUARD is mindful that Plaintiffs' experts have offered a different theory of the cause of Loss during the course of this action. It is their opinion that storm water backed up on the roof and entered the Property through roof vent(s) and/or mechanical openings because drainage of storm water through the roof's lone drain

(also known as a scupper) was obstructed by wind-blown leaves, vegetation and debris. Even if the Loss was caused by such water backup from the roof's drain, the breach of contract claim still fails because the Policy also excludes coverage for that type of loss except for an endorsement providing limited coverage for loss due to "[W]ater…which backs up through or overflows or is otherwise discharged from a…drain at your premises…" that is capped at $10,000 ("Back Up/Overflow Endorsement"). AmGUARD has already paid Aladdin $24,829 in connection with the Loss, which is more than twice the maximum amount recoverable under that endorsement. Accordingly, even accepting Plaintiffs' theory of causation, there is no breach of contract as a matter of law because AmGUARD has already satisfied any payment obligation arising under the Back Up/Overflow Endorsement.

Plaintiffs' bad faith claim fares no better. Absent a breach of the Policy, there can be no liability for bad faith. Moreover, the undisputed evidence establishes that AmGUARD had a reasonable basis for its coverage denial because the causes of the Loss determined by engineering consultant Keystone do not qualify for Policy coverage. At a minimum, the evidence establishes a genuine dispute concerning coverage, which independently precludes bad faith liability as a matter of law. For the same reasons there is no evidence, and certainly not clear and convincing evidence, that AmGUARD engaged in oppression, fraud, or malice sufficient to support Plaintiffs' request for punitive damages.

Further, even if the Court declines to grant summary judgment for some reason, AmGUARD is entitled to partial summary judgment as to multiple other discrete issues including the following: (1) Khalaf lacks standing to pursue claims under the Policy because Aladdin is the named insured and Khalaf is not a party to the insurance contract; (2) the Policy expressly limits business income loss coverage to losses sustained within twelve consecutive months following the date of direct physical loss or damage, thereby precluding recovery for business income losses sustained after August 20, 2024; (3) Plaintiffs cannot recover the cost of

installing a new roof at the Property because the Policy does not include building coverage for the Property, the roof is not an improvement or betterment installed by or on behalf of Plaintiffs and the roof was not damaged due to the Loss; and (4) the Policy precludes coverage for repairs to the interior of the Property claimed by Plaintiffs, and even if the Back Up/Overflow Endorsement covers the Loss, such repairs are not covered because AmGUARD has paid all Policy benefits due under that Endorsement.

## II. FACTUAL BACKGROUND

### A. THE POLICY

AmGUARD issued businessowners policy no. ALBP356464 to Aladdin effective October 1, 2022 to October 1, 2023 ("Policy"). [Uncontroverted Fact ("UF") 1.] The Policy does not provide building coverage for the Property, as no limit of insurance for such coverage is set forth in the Policy's Declarations. [UF 2.] Instead, the Policy includes coverage for tenant improvements and betterments at the Property ("TIBs") up to a limit of $500,000, business personal property up to a limit of $500,000, and business income and extra expense for the actual loss sustained up to 12 months provided such loss occurs within 12 consecutive months after the date of direct physical loss or damage. [UF 3-5.] The Policy defines TIBs as "…fixtures, alterations, installations or additions: (a) [M]ade a part of the building or structure you occupy but do not own; and (b) [Y]ou acquired or made at your expense but cannot legally remove…" [UF 6.] Coverage is subject to a $1,000 deductible. [UF 7.]

#### 1. Limitations And Exclusions

The Policy includes terms limiting and/or excluding coverage for certain losses. [UF 8-14.] For instance, the Policy states AmGUARD:

> …will not pay for loss of or damage to…[T]he interior of any building or structure caused by or resulting from rain…,whether driven by wind or not, unless…[T]he building or structure first sustains damage by a

> Covered Cause of Loss to its roof or walls through which the rain enters… .

("Interior Damage Limitation"). [UF 8.] Additionally, the Policy excludes coverage for loss of or damage to property caused by "[R]ust or other corrosion, decay, deterioration…" (Deterioration Exclusion), "[W]ear and tear…" (Wear and Tear Exclusion) and "[F]aulty, inadequate or defective…[M]aintenance of part or all of any property on or off the described premises…" (Faulty Maintenance Exclusion). [UF 9-11.]

### 2. Back Up/Overflow Endorsement

The Policy also contains a Restaurant Plus Endorsement providing additional coverage for "Water Backup and Sump Overflow" ("Back Up/Overflow Endorsement"). [UF 12.] That Endorsement caps benefits for loss due to "[W]ater…which backs up through or overflows or is otherwise discharged from a…drain at your premises…" at $5,000 for covered property and $5,000 for business income and extra expense. [UF 13.] Aside from the Back Up/Overflow Endorsement, the Policy excludes coverage for loss or damage caused by "[W]ater that backs up or overflows or is otherwise discharged from a…drain…" ("Back Up/Overflow Exclusion"). [UF 14.]

## B. PLAINTIFFS AND THE PROPERTY

At all relevant times, Khalaf was an owner of Aladdin. [UF 15.] Plaintiffs operate the Property as a Mediterranean restaurant. [UF 16.] Khalaf began leasing the Property in or around 1993, though Aladdin is the current tenant of the premises. [UF 17-18.] Pursuant to the lease agreement for the Property, the landlord is obligated to main the roof, the foundations and structural portions of the Property. [UF 19.]

The Property includes a low-sloped roof enclosed on all four sides by parapet walls, and there is only one drain on the back wall (also known as a "scupper"). [UF 20.] In or around 2015, Plaintiffs retained Design Perspectives to provide food

service and interior design plans for the remodel of the Property from February through June 2015. [UF 21.] The remodel did not include improvements to the roof of the Property. [UF 22.]

### C. The February Loss

On February 12, 2023, the interior of the Property sustained water damage due to a rainstorm ("February Loss"). [UF 23.] Aladdin submitted a claim to AmGUARD regarding the February Loss. [UF 24.] AmGUARD retained independent adjuster Crawford & Company to inspect the Property and prepare an estimate of the damage. [UF 25.] By letter dated March 22, 2023, AmGUARD issued a payment in the amount of $3,640.13 for damage to ceiling tiles and floor cleaning in the dishwashing room, dry storage/preparation area and dining room due to the February Loss. [UF 26.]

### D. The August Loss and AmGUARD's Investigation

On or about August 20, 2023, rain from Hilary entered the Property through the roof and damaged the interior of the building ("Loss"). [UF 27.] On August 22, 2023, Plaintiffs reported the Loss to AmGUARD. [UF 28.] On the same day, AmGUARD contacted Plaintiffs to begin its investigation of the Claim. [UF 29.] Following notice of the Loss, AmGUARD retained independent adjuster Pilot Catastrophe Services ("Pilot") to assist in AmGUARD's investigation of Policy coverage for the Loss. [UF 30.] On August 28, 2023, Pilot visually inspected the exterior and interior of the Property. [UF 31.] Pilot, however, did not inspect the roof. [UF 32.]

On September 12, 2023, AmGUARD received Pilot's inspection report. [UF 33.] The report noted that Pilot observed roof leak damage to ceiling tiles and grids in the Property's kitchen and two dining rooms, but did not see any damage to the exterior or interior walls. [UF 34.] Pilot prepared an estimate to repair damage to the ceiling tiles and grids totaling $25,829. [UF 35.] After reviewing Pilot's report, AmGUARD's Claim Representative Scott Shaver ("Shaver") entered a claim note

stating “[T]here does not appear to be any coverage concerns…”, and caused payment to be issued to Aladdin totaling $24,829 (accounting for the Policy’s $1,000 deductible). [UF 36-37.] AmGUARD also received Aladdin’s lease and addendums thereto from Pilot on September 14, 2023. [UF 38.] On September 19, 2023, Shaver advised Khalaf of the payment being issued. [UF 39.]

On October 24, 2023, Shaver was advised by Khalaf that he obtained a repair estimate for the Property totaling approximately $500,000 and the restaurant would be closed for seven weeks for repairs. [UF 40.] AmGUARD subsequently received a (1) report from ET&T Indoor Environmental (“ET&T”) dated September 11, 2023, which described ET&T’s findings following its inspection of the Property including water damage (visible mold growth, water staining, elevated moisture levels in walls, and/or bowing of ceiling tiles) in the kitchen, bar and cooking station, dining room areas and/or hallway near the bathrooms and (2) repair estimate from BKB Enterprises, Inc. (“BKB”) totaling $495,929.49 for repairs to the Property’s interior walls, ceiling, lighting/electrical/HVAC components, flooring and replacement of an interior cooler/freezer box and the roof. [UF 41-42.]

Shaver conferred with his supervisor Darren Heiser (“Heiser”) about the additional documents provided on behalf of Aladdin. [UF 43.] On November 8, 2023, Heiser entered a claim note describing AmGUARD’s plan of action as follows: (1) engage engineering consultant Keystone to inspect the roof to confirm how the interior water entry occurred and whether said entry resulted from Hilary; (2) contact insured to advise of need to inspect; (3) send a reservation of rights letter regarding coverage concerns; (4) confirm with insured whether there was a complete buildout of the Property, and if so, secure proof of the buildout performed by Aladdin; and (5) proceed with the coverage determination once the engineer’s report is received. [UF 44.] That same day, AmGUARD’s Claim Representative Alex Wolfe informed Khalaf of Keystone’s assignment and requested documents to corroborate Aladdin’s 2014/2015 buildout of the Property. [UF 45.]

Keystone inspected the Property including the roof on November 10, 2023. [UF 46.] The inspection was performed by licensed engineer Bradley Gerlick ("Gerlick") of Keystone, who has also been retained as an expert by AmGUARD in this suit. [UF 47.] Keystone issued its inspection report dated November 14, 2023, noting the following:

> Keystone inspected the low-sloped roof for physical damage consistent with wind, and did not identify any torn, creased, or detached and displaced modified bitumen sheets caused by wind…
>
> * * *
>
> The most common mechanism of water intrusion is lack of maintenance and/or deterioration of the roofing system or sealant around windows and doors. Like all building elements, these components have a life expectancy. The roofing system and the exterior elements will age and deteriorate over time and eventually fail. Routine maintenance can prolong the usable lifespan and prevent moisture intrusion into the areas that wear out the fastest. This is commonly located at the seals around windows, doors, vents or pipe jacks, or in the sealant used in the flashings around chimneys and other raised areas of the roofing system. UV rays and cycles of thermal expansion and contraction eventually degrade the rubber seals or sealants and cause them to crack and disengage. During a rain event, the resulting cracks and deterioration will allow water to enter into the building…
>
> * * *
>
> …In the interstitial space above the ceiling, there were numerous areas where the sheathing and framing elements had stains that were dark in color, indicative of long-term water exposure that was inconsistent with wetting due to wind-driven rain during a one-time storm event; This further supported a long-term and ongoing condition of water intrusion through the roof envelope above. On the roof above these areas, there were no displaced and missing roof covering elements due to wind which indicated that ongoing water intrusion was not due to water emanating through a wind-created opening. Rather, there were numerous existing openings including unsealed electrical penetrations, unsealed surface driven fasteners through the modified bitumen on the parapet walls, deteriorated sealant around roof penetrations, deteriorated sealant on the mechanical curbs, deteriorated sealant on

> the parapet walls, and deteriorated underlayment (with exposed roof sheathing); These openings allow for water intrusion in the absence of wind.
>
> During our inspection, the tenant provided videos showing dripping water from between the ceiling panel seams of the cooler, and extensive water pouring from the ceiling of the food preparation area. These areas were located near an overlying roof vent with a rim that was approximately two inches above the surface of the low-sloped roof. The low-sloped roof was enclosed on all four sides by parapet walls, and there was only one drain on the back parapet wall; This opening is the only opening through which water (that accumulates from the full area of the low-sloped roof) must drain from, and there was ballast on the roof accumulated around this area which obstructs the flow of water resulting in deficient drainage and an accumulation of water. During the passage of Hurricane Hilary, the property was exposed to a prolonged period of extensive rainfall, and water intrusion was due to an accumulation of heavy rainfall that rose to a depth that exceeded the aforementioned roof vent rim, allowing for water to profusely flow through the opening and into the building.

[UF 48.]

During Keystone's inspection, Gerlick looked for and did not observe any evidence of wind-blown debris lodged in the scupper. [UF 49.] Also, Keystone was not provided with any photographs, video or other evidence indicating wind-displaced debris was lodged in the scupper at the time of Loss. [UF 50.]

Keystone concluded (1) the roof and exterior elements were not damaged or displaced by wind and there was no intrusion due to a wind-created opening, and instead, (2) damage to the interior finishes was caused by a combination of (a) long-term water intrusion through existing openings including deteriorated sealant around roof penetrations, deteriorated sealant on the mechanical curbs, deteriorated sealant on the parapet walls and deteriorated underlayment (Deteriorated Roof Conditions) and (b) heavy rainfall during the one-time storm event that backed up on the roof and overflowed the roof vent. [UF 51.]

On November 10, 2023, Khalaf provided AmGUARD with the applications

and plans concerning the 2015 remodel of the Property. [UF 52.] In response, AmGUARD inquired about the status of invoices from the contractor who performed the 2015 remodel. [UF 53.]

On November 28, 2023, Khalaf provided AmGUARD with (1) a receipt for health department fees for plan check and permit from the 2015 remodel of the Property, and (2) a letter dated November 27, 2023 from Tony Adamo of Design Perspectives, which confirmed Khalaf contracted with Design Perspectives to provide food service and interior design plans for the remodel of Aladdin's restaurant from February through June of 2015. [UF 54.] The letter does not indicate remodel work at the Property included improvements to the roof, and Khalaf never advised AmGUARD that Aladdin's improvements and betterments to the Property included the roof. [UF 55-56.]

On January 8, 2024, Khalaf advised Shaver that "[A]ll the area that got the water damage was done new 2015." [UF 57.] AmGUARD issued a reservation of rights letter to Aladdin on January 9, 2024, advising AmGUARD was in the process of completing its investigation of Policy coverage for the Loss. [UF 58.] The letter cites various provisions of the Policy implicated by the Loss including, but not limited to, the Deterioration Exclusion, Wear and Tear Exclusion and Faulty Maintenance Exclusion. [UF 58.]

AmGUARD denied coverage for the Loss by letter to Aladdin dated January 30, 2024 based on Keystone's investigation and conclusions about the cause of Loss, the Interior Damage Limitation, Deterioration Exclusion, Wear and Tear Exclusion and Faulty Maintenance Exclusion. [UF 59.] Shaver advised Khalaf of the coverage denial during a telephone call on January 30, 2024, noting the initial payment of $24,829 was made "prior to having all of the facts of loss, without properly inspecting the roof…" and AmGUARD would not request reimbursement of that payment. [UF 60.]

### E. <u>THIS ACTION & DAMAGES CLAIMED BY PLAINTIFFS</u>

Plaintiffs filed this action on July 8, 2025, alleging AmGUARD wrongfully denied coverage for the Loss. [UF 61.] The Complaint alleges causes of action against AmGUARD for breach of contract and bad faith, and seeks compensatory as well as punitive damages. [UF 61.]

On August 1, 2025, Khalaf entered a contract with Sawah Construction Inc. dba 4S Construction ("4S") for construction work at the Property totaling $1,140,025.60. [UF 62.] The contract describes amounts for replacement of the roof totaling $104,450, as well as repairs to the interior of the Property including demolition of the interior ($138,025), plumbing work ($68,320), electric work ($84,000), mechanical work ($96,280), flooring and baseboard work ($67,210), drywall and T-bar work ($209,560), furniture and equipment related work ($46,000), rental costs ($20,800) and costs for plans, permits and special inspections ($56,000). [UF 63.] The contract also includes amounts for overhead and insurance ($71,251.60) and profit ($178,129). [UF 64.]

Plaintiffs claim the Property was closed in May 2025 and April 2026 for repairs due to Hilary. [UF 65.] Aladdin allegedly sustained lost profits during that time totaling $89,720 inclusive of interest. [UF 66.]

### F. <u>EVIDENCE REGARDING THE CAUSE(S) OF LOSS</u>

Plaintiffs retained two experts to opine on the cause of the Loss: general and engineering contractor Shanon Chilson ("Chilson") and structural engineer Eduardo Avelar, P.E., S.E. ("Avelar"). [UF 67.] Both experts agree with Keystone that Hilary did not damage or displace the roof or exterior elements of the Property, and storm water did not enter the Property through a storm-created opening. [UF 48, 51, 68-69.] Chilson and Avelar also do not dispute the existence of the Deteriorated Roof Conditions. [UF 48, 51, 70.] Avelar does not dispute the possibility that storm water entered the Property due to those conditions. [UF 71.]

Chilson and Avelar, however, opine that the Loss was caused by water that

backed up on the roof and entered the Property through the roof vent(s) and/or mechanical openings due to wind-blown leaves, vegetation, and debris that obstructed the drainage of water through the scupper. [UF 72.] These opinions are based in part on a video depicting water and leaves draining into the scupper, and an individual removing leaves and two twigs from the area near the scupper. [UF 73.] Chilson and Avelar were informed that the video was taken at the time of Loss, but neither expert conducted any investigation to determine when the video was actually created. [UF 74.] Chilson and Avelar did not test the rate at which water flows through the scupper without obstructions, and are unable to quantify how much the flow of storm water through the drain was impacted by the leaves, vegetation and debris at the time of Loss. [UF 75-76.]

## III. SUMMARY JUDGMENT IS WARRANTED IN AMGUARD'S FAVOR

### A. LEGAL STANDARD

A party may move for summary judgment, identifying each claim or defense-or the part of each claim or defense-on which summary judgment is sought. FED. R. CIV. P. 56(a). Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The interpretation of an insurance policy is a question of law for the Court. Blue Ridge Ins. Co. v. Stanewich, 142 F. 3d 1145, 1147 (9th Cir. 1998). Summary judgment is therefore appropriate where, as here, there are no material issues of fact and the sole question before the Court is one of law. Homestead Ins. Co. v. Ryness Co., 851 F. Supp. 1441, 1443 (N.D. Cal. 1992).

The initial burden of establishing the absence of a genuine issue of material fact falls on the moving party. Celotex, 477 U.S. at 322. The movant can carry his burden in two ways: (1) by presenting evidence that negates an essential element of

the nonmoving party's case; or (2) by demonstrating that the nonmoving party "failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." Id. at 322-23. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987); Celotex, 477 U.S. at 325. Once the moving party establishes the absence of genuine issues of material fact, the burden shifts to the nonmoving party to set forth facts showing that a genuine issue of disputed fact remains. Celotex, 477 U.S. at 324.

Summary judgment motions touching upon contract interpretation, in particular, may be granted when the contract is unambiguous. S. Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885, 888 (9th Cir. 2003). Because this is a diversity action, the court must apply state law in interpreting an insurance policy. SDR Capital Mgmt., Inc. v. Am. Int'l Specialty Lines Ins. Co., 320 F. Supp. 2d 1043, 1046 (S.D. Cal. 2004). The interpretation of an insurance policy presents a question of law for this court to decide. Waller v. Truck Ins. Exch. Inc., 11 Cal. 4th 1, 18 (1995).

As further explained below, AmGUARD is entitled to judgment as a matter of law based on undisputed facts revealing (1) there are three potential causes of the Loss, (2) the Policy precludes coverage for all three of those causes except for the limited coverage provided by the Back Up/Overflow Endorsement ($10,000) which has already been paid by AmGUARD and (3) Plaintiffs' bad faith claim fails as a matter of law because AmGUARD has not breached the Policy and there is at least a genuine dispute as to whether the Policy covers the Loss.

## B. PLAINTIFFS' BREACH OF CONTRACT CLAIM FAILS

"An insured can pursue a breach of contract theory against its insurer by alleging the insurance contract, the insured's performance or excuse for nonperformance, the insurer's breach, and resulting damages." San Diego Hous. Comm'n v. Indus. Indem. Co., 68 Cal. App. 4th 526, 536 (1998) (citation omitted).

An action for breach of an insurance contract requires a showing that the insurer failed to pay some policy benefits due and owing on the claim. Reichert v. Gen. Ins. Co. of Am., 68 Cal. 2d 822, 830 (1968).

"In first party property cases, the right to coverage comes from the terms of the contract, i.e., it turns on determining causation of a loss and identifying whether it is covered or excluded." San Jose Crane & Rigging, Inc. v. Lexington Ins. Co., 227 Cal. App. 3d 1314, 1319 (1991). An insured must show that a loss falls within the coverage provided by an insurance policy. Weil v. Federal Kemper Life Assurance Co., 7 Cal. 4th 125, 148 (1994). If the insured makes that showing, the burden shifts to the insurer to prove the claim is excluded. Garvey v. State Farm Fire & Cas. Co., 48 Cal. 3d 395, 406 (1989).

Whether a claim is covered or excluded under the terms of the policy turns not on whether the alleged cause of the loss was a concurrent cause of the damage, but whether it was the "efficient proximate cause" of the loss. Brodkin v. State Farm Fire & Cas. Co., 217 Cal. App. 3d 210, 216 (1989). The efficient proximate cause is the most important cause of the loss. Anacapa Marine St., LLC v. Travelers Cas. Ins. Co. of Am., 834 F. Supp. 3d 869, 881 (C.D. Cal. 2026) (applying California law). If the facts are undisputed, determination of the efficient proximate cause becomes a question of law. Berry v. Commercial Union Ins. Co., 87 F.3d 387, 391 fn. 8 (9th Cir. 1996) (applying California law).

Summary judgment is proper if all alleged causes of the loss are excluded. See Brodkin, 217 Cal. App. 3d at 217-218; Loughney v. Allstate Ins. Co., 465 F. Supp. 2d 1039, 1042 (S.D. Cal. 2006) (applying California law) (there is no coverage under an insurance policy when the cause of damage is an excluded peril). Similarly, an insurer is entitled to summary judgment when it pays all policy benefits due under an endorsement that provides coverage for a loss and all other potential causes of the loss are not covered. See Victoria Fam. Ltd. Liab. Ltd. P'ship v. Ohio Sec. Ins. Co., 475 F. Supp. 3d 1106, 1114-1116 (S.D. Cal. 2020)

(applying California law) (granting insurer summary judgment where it paid the water back-up endorsement limit and the balance of the loss was otherwise excluded).

Here, the parties' retained experts have collectively identified three causes of the Loss: (1) rain that entered the Property through the roof vent(s) and/or mechanical openings and not through a storm created opening (i.e., "…damage by a Covered Cause of Loss to its roof or walls through which the rain enters.."); (2) the Deteriorated Roof Conditions; and (3) storm water that backed up on the roof because drainage through the roof drain was obstructed by wind-blown leaves, vegetation and debris. Plaintiffs' breach of contract claim necessarily fails as a matter of law and should be adjudicated in favor of AmGUARD because the Policy precludes coverage for all three causes except for coverage under the Back Up/Overflow Endorsement which is capped at $10,000 and has already been paid by AmGUARD, as further discussed below.

**1. <u>The Loss is Not Covered Because the Building Did Not First Sustain Damage by a Covered Cause of Loss</u>**

The plain language of the Interior Damage Limitation unambiguously precludes coverage for the damage resulting from the Loss. The Policy covers damage to the interior of a building caused by rain, but only if the building is first damaged by a covered cause of loss that allows the rain to enter.

Here, there is no evidence of damage to the Property's roof or exterior walls through which rain was able to enter the Property. As discussed above, Keystone's investigation revealed there was no such damage, and Plaintiffs' own retained experts agree and concede that Hilary did not damage the roof or exterior and no storm created opening allowed water to enter the Property. Because the undisputed evidence, including the opinions of Plaintiffs' own experts, establishes the Property did not "first sustain[] damage by a Covered Cause of Loss to its roof or walls through which the rain enter[ed]," the Interior Damage Limitation unambiguously

bars coverage for the Loss. See Diep v. Cal. Fair Plan Ass'n, 15 Cal. App. 4th 1205, 1210-1211 (1993) (no coverage for interior rain damage absent a covered cause of loss creating an opening in the roof).

**2. The Loss is Not Covered Due to the Deterioration, Wear and Tear, and Faulty Maintenance Exclusions**

Keystone's inspection of the Property also revealed the Deteriorated Roof Conditions, including deteriorated sealant around roof penetrations, deteriorated sealant on the mechanical curbs, deteriorated sealant on the parapet walls and deteriorated underlayment. Keystone's inspection report to AmGUARD notes (1) these building components have a life expectancy and age and deteriorate over time, (2) UV rays and cycles of thermal expansion and contraction degrade sealants and cause them to crack and disengage, (3) routine maintenance can prolong the usable lifespan and prevent moisture intrusion through areas that wear out the fastest and (4) the Deteriorated Roof Conditions allowed water to enter the Property. Plaintiffs' experts Chilson and Avelar do not dispute the presence of the Deteriorated Roof Conditions, and Avelar acknowledges the possibility that storm water entered the Property due to such conditions.

The Deterioration Exclusion, Wear and Tear Exclusion and/or Faulty Maintenance Exclusion prohibit coverage for loss of or damage to the Property caused by the Deteriorated Roof Conditions. Brodkin, 217 Cal. App. 3d at 217 (plain meaning of exclusion for loss caused by "deterioration" is that insurer will not cover loss caused by slow-moving disintegration); Meridian Leasing, Inc. v. Associated Aviation Underwriters, Inc., 409 F.3d 342, 353 (6th Cir. 2005) (applying California law) ("wear and tear" means damage resulting from normal or ordinary use of insured property); Waldsmith v. State Farm Fire & Cas. Co., 232 Cal. App. 3d 693, 696 (1991) (where building was damaged by landslide and parties stipulated loss was caused by city water main in street adjacent to insured property that was negligently maintained and broke, policy clearly excluded

coverage by provision eliminating coverage for loss consisting of "fault or unsoundness in…maintenance of any property…on or off the residence premises…"). AmGUARD did not breach the Policy because there is no coverage for such loss or damage.

**3. At Most, Coverage For The Loss Is Capped at $10,000, Which AmGUARD Has Already Paid**

Even assuming, *arguendo*, that the Court determines water that backed up from the roof drain was the efficient proximate cause of the Loss, Plaintiffs still cannot establish a breach of the Policy. Indeed, under Plaintiffs' own theory, the Loss is excluded by the Back Up/Overflow Exclusion, and at best, falls squarely within the limited coverage provided by the Back Up/Overflow Endorsement, which concerns water that "backs up through or overflows or is otherwise discharged from a . . . drain…" [UF 12.] Both the Back Up/Overflow Exclusion and Back Up/Overflow Endorsement unambiguously apply to water that comes up out of a drain ("backs up") and water that spills over from a drain and/or cannot proceed down a drain ("overflows") due to blockage. See Cardio Diagnostic Imaging, Inc. v. Farmers Ins. Exch., 212 Cal. App. 4th 69, 74-76 (2012) (discussing exclusion for "[W]ater that backs up or overflows from a…drain…", finding such language is unambiguous and a layperson would understand it to include both water that comes up out of a sewer, drain, or sump ("backs up") and water that spills over from a sewer, drain, or sump ("overflows") due to blockage; rejecting argument that language does not include water that is unable to proceed down a drain).

Critically, the Endorsement limits recovery to $5,000 for covered property damage and an additional $5,000 for business income and extra expense, for a combined maximum of $10,000. AmGUARD has already paid Aladdin $24,829 in connection with the Loss, more than twice the maximum amount recoverable under the Back Up/Overflow Endorsement.

Thus, even if Plaintiffs could establish obstruction of drainage through the

roof scupper caused the Loss, that finding would not entitle them to any additional Policy benefits. AmGUARD has already paid substantially more than the Policy requires under that theory, and as a result, Plaintiffs cannot prove AmGUARD breached the Policy by failing to pay all Policy benefits due under the Back Up/Overflow Endorsement. See Ives v. Allstate Ins. Co., 520 F. Supp. 3d 1248, 1255 (C.D. Cal. 2021) (applying California law) ("There can be no breach of contract where an insurer pays all benefits due."); Janney v. CSAA Ins. Exch., 70 Cal. App. 5th 374, 390, 398-399 (2021) (insured could not prove third element of breach of contract cause of action, insurer's breach of policy, where undisputed evidence established insurer paid all amounts due under policy as a result of wildfire that destroyed insured's home).

### C. PLAINTIFFS' BAD FAITH CLAIM FAILS

#### 1. Without Coverage There Can Be No Bad Faith

It is well established that an insured must demonstrate breach of contract before it can recover for bad faith. See Jordan v. Allstate Ins. Co., 148 Cal. App. 4th 1062, 1078 (Ct. App. 2007); Waller, 11 Cal. 4th at 36; see also Cal. State Auto. Ass'n Inter-Ins. Bureau v. Superior Court, 184 Cal. App. 3d 1428, 1433 (1986) (no award for bad faith can be made "without first establishing that coverage exists"). As demonstrated above, there is no coverage for the Loss under the Policy, and even if there is coverage due to the Back Up/Overflow Endorsement, AmGUARD has paid the Policy's $10,000 limit for that coverage. Therefore, since the breach of contract claim fails, the bad faith claim necessarily fails as well, justifying summary judgment for AmGUARD.

#### 2. Plaintiffs Cannot Show AmGUARD Acted in Bad Faith

Additionally, a breach of the implied covenant of good faith and fair dealing involves something beyond breach of the contractual duty itself. Chateau Chamberay Homeowners Ass'n v. Associated Int'l Ins. Co., 90 Cal. App. 4th 335, 345 (2001) (quotation omitted). The mere denial of policy benefits does not

demonstrate bad faith; bad faith implies unfair dealing rather than mistaken judgment. Cal. Shoppers, Inc. v. Royal Globe Ins. Co., 175 Cal. App. 3d 1, 15, 54-55 (1985). Indeed, the ultimate test of bad faith liability in a first-party case is whether the refusal to pay benefits was unreasonable under the circumstances; before an insurer can be found to have acted tortiously, i.e., in bad faith in refusing to bestow policy benefits, it must have done so without proper cause. Opsal v. United Servs Auto. Ass'n, 2 Cal. App. 4th 1197, 1205 (1991).

Further, in the context of first party property claims, it is settled that: "The mistaken [or erroneous] withholding of policy benefits, if reasonable or if based on a legitimate dispute as to the insurer's liability under California law, does not expose the insurer to bad faith liability." Chateau, 90 Cal. App. 4th at 346 (quotations omitted). As well, "[t]he 'genuine dispute' doctrine may be applied where the insurer denies a claim based on the opinions of experts". Fraley v. Allstate Ins. Co., 81 Cal. App. 4th 1282, 1292 (2000).

Importantly, this Court is *not* required to determine whether AmGUARD's denial of coverage for the Loss based on the Interior Damage Limitation and Deterioration, Wear and Tear and/or Faulty Maintenance Exclusions was correct in order to issue summary judgment in AmGUARD's favor as to the bad faith claim. As stated in Chateau:

> …the issue of bad faith may, in specific instances, be treated as an issue of law. [Citation.]…Given the record we have before us, we find that this case falls within the ambit of the foregoing principles. We are not called upon to determine whether AIIC's view as to the proper outcome of the adjustment process was correct. It is only necessary for us to determine that, *in light of the record as a whole,* its position with respect to the disputed points was *reasonable* or that AIIC had *proper cause* to assert the positions that it did.

90 Cal. App. 4th at 350.

Here, upon receiving notice of the Loss, AmGUARD engaged independent

adjuster Pilot to inspect the Property and issued payment to Aladdin totaling $24,829 in September 2023 based on damage to interior ceiling tiles and grids which was the only damage to the Property observed by Pilot. AmGUARD subsequently retained engineering consultant Keystone to inspect the roof and determine how storm water entered the Property after being notified of Plaintiffs' request for additional Policy benefits in October 2023. Keystone determined (1) Hilary did not cause damage to the roof or exterior of the Property, (2) rain did not enter the Property due to a storm created opening, (3) storm water overflowed the roof vent and entered the premises through the vent and (4) storm water entered the Property through the Deteriorated Roof Conditions. While Plaintiffs have alleged during the course of this action that the Loss was caused by leaves, vegetation and debris that obstructed water drainage through the scupper, Keystone did not observe such conditions during its inspection of the Property and was not provided any photos, video or other information indicating such conditions existed at the time of the Loss.

Additionally, the pre-denial payment of $24,829 did not preclude AmGUARD from further investigating coverage for the Loss and changing its coverage determination. Udinsky v. State Farm Fire & Cas. Co., No. 18-CV-03994-JSC, 2019 WL 1017606 *9-12 (N.D. Cal. Mar. 4, 2019) (applying California law) (insurer did not lose right to deny coverage for claim for property damage due to sewage backup based on claim representative's initial acceptance of coverage and issuance of partial payment for claim; because policy's sewage backup exclusion precluded coverage for the claim such that coverage did not originally exist at the time of cause of loss, it was impermissible under California law to hold insurer liable based on doctrines of implied waiver or estoppel); Manneck v. Lawyers Title Ins. Corp., 28 Cal. App. 4th 1294 (1994) (quoting Aetna Cas. & Sur. Co. v. Richmond, 76 Cal. App. 3d 645, 653 (1977)) (the rule is well established that the doctrines of implied waiver and estoppel, based upon the conduct or action of

the insurer, are not available to bring within the coverage of a policy risks not covered by its terms, or risks expressly excluded therefrom); Miller v. Elite Ins. Co., 100 Cal. App. 3d 739, 755 (1980) (estoppel cannot be used to create coverage under an insurance policy where such coverage did not originally exist).

Accordingly, even if the Court determines for some reason that AmGUARD erroneously denied Policy coverage for the Loss, it was certainly reasonable to deny coverage based on Keystone's findings about the cause(s) of Loss and Policy terms that preclude coverage for the causes identified by Keystone including the Interior Damage Limitation and Deterioration, Wear and Tear and/or Faulty Maintenance Exclusions. See Delgado v. Heritage Life Ins. Co., 157 Cal. App. 3d 262, 277 (1984) (insurer's interpretation of policy that is not inherently unreasonable is not conclusive evidence of bad faith).

The reasonableness of AmGUARD's denial is confirmed by Plaintiffs' own experts, who agree that Hilary did not damage the roof or exterior or create any opening through which rain entered the Property, the very premise of AmGUARD's coverage determination. At the very least, there is a genuine dispute as to whether the Policy covers the Loss in light of Keystone's investigation, which forecloses bad faith liability as a matter of law.

Accordingly, if summary judgment is denied, AmGUARD should at least have partial summary judgment as to the bad faith claim since AmGUARD only acted reasonably and with proper cause, in determining the Policy precludes coverage for the Loss.

### D. PLAINTIFFS' PUNITIVE DAMAGES CLAIM FAILS

Even if the Court does not grant summary judgment or partial summary judgment as to the claims for breach of contract and/or bad faith, it should do so with respect to the punitive damages claim. Notably, in order to recover punitive damages, a plaintiff must establish by *clear and convincing* evidence that the defendant "has been guilty of oppression, fraud, or malice." CA. CIV. CODE § 3294

(emphasis added). Malice and oppression, as defined by California Civil Code section 3294, require an intent to cause injury or "despicable conduct." Fraud requires an intentional misrepresentation, deceit, or concealment. "Despicable conduct" is defined as conduct that "is so vile, base, contemptible, miserable, wretched or loathsome that it would be looked down upon and despised by ordinary decent people." Mock v. Michigan Millers Mut. Ins. Co., 4 Cal. App. 4th 306, 331 (1992). Such conduct has been described as "[having] the character of outrage frequently associated with crime." Tomaselli v. Transamerica Ins. Co., 25 Cal. App. 4th 1269, 1287 (1994) (citation omitted).

In determining the appropriateness of punitive damages, courts must take into account the heightened "clear and convincing evidence" standard imposed by California Civil Code section 3294. In other words, both the evidentiary standard as well as the requisite level of misconduct required to warrant punitive damages are much higher than those required for bad faith. See Lunsford v. Am. Guar. & Liab. Ins. Co., 18 F.3d 653, 656 (9th Cir. 1994) (summarily disposing of punitive damages claim where bad faith claim rejected as a matter of law); Casey v. Metropolitan Life Ins. Co., 688 F. Supp. 2d 1086, 1101 (E.D. Cal. 2010) ("Clear and convincing evidence has to be 'so clear as to leave no substantial doubt [and] sufficiently strong to command the unhesitating assent of every reasonable mind.'") (citation omitted). This higher clear and convincing evidentiary standard applies at every stage of the litigation process, including summary adjudication. Adams v. Allstate Ins. Co., 187 F. Supp. 2d 1219, 1231 (C.D. Cal. 2002).

As discussed above, AmGUARD's denial of Policy coverage was correct and reasonable based on Keystone's investigation which revealed the Loss was caused by perils that do not qualify for Policy coverage. At the very least, the decision to deny coverage for the Loss was made in good faith, considering the terms of the Policy and court decisions discussed herein that support AmGUARD's interpretation of and reliance upon the Interior Damage Limitation and

Deterioration, Wear and Tear and Faulty Maintenance Exclusions. There can be no finding of punitive damages since AmGUARD's interpretation of the Policy was reasonable and made in good faith. See Mason v. Mercury Cas. Co., 64 Cal. App. 3d 471, 475 (1976) (a finding of malice cannot be predicated on the mere fact of a divergent interpretation of an insurance contract as long as the insurer's interpretation was rendered in good faith). The evidentiary record is thus devoid of evidence of fraudulent, malicious or oppressive conduct by AmGUARD that could possibly support a claim for punitive damages, and certainly no clear and convincing evidence of such conduct exists. While the Court should grant summary judgment in favor of AmGUARD as to all of Plaintiffs' claims, there is no question that AmGUARD is at least entitled to partial summary judgment with respect to the punitive damages claim.

### E. AmGUARD Is Entitled To Partial Summary Judgment As To Other Issues If Summary Judgment Is Not Granted

In the event the Court determines for some reason that summary judgment is not proper, partial summary judgment should be granted as to the additional following claims.

#### 1. Khalaf Lacks Standing to Sue on the Policy

Khalaf's individual claims fail for the independent reason that he is not a party to the Policy. One who is "not a party to the contract has no standing to enforce the contract or to recover extra-contract damages for wrongful withholding of benefits to the contracting party." Hatchwell v. Blue Shield of Cal., 198 Cal. App. 3d 1027, 1034 (1988). AmGUARD issued the Policy to Aladdin as the named insured. Khalaf is Aladdin's officer, not an insured. Only a party to the insurance contract (or an express beneficiary of it) may sue for its breach, and the implied covenant of good faith and fair dealing exists only to protect the contracting parties' interests under that contract. Because Khalaf is not an insured under the Policy, he lacks standing to assert either the breach of contract or the bad faith

claim, and AmGUARD is entitled to summary judgment on all claims asserted by Khalaf.

**2. <u>Plaintiffs Cannot Recover Business Income Loss Sustained More Than Twelve Months After the Date of Loss</u>**

It is undisputed that the Loss occurred on August 20, 2023. Plaintiffs seek damages totaling $89,720 for business income loss sustained in May 2025 and April 2026 while the restaurant was closed for repairs necessitated by Hilary.

The Policy, however, provides business income and extra expense coverage "for all loss sustained up to 12 months provided such loss occurs within 12 consecutive months after the date of direct physical loss or damage." Applying the Policy's language, business income loss coverage extends only to loss sustained during the twelve consecutive months after that date, that is, through on or about August 20, 2024. Since Plaintiffs' claimed business income loss was sustained after that date in May 2025 and April 2026, any and all such loss does not qualify for Policy coverage as a matter of law.

**3. <u>Plaintiffs Are Not Entitled to Policy Benefits for Installation of a New Roof at the Property</u>**

Under California law, an insurance policy must be interpreted according to its terms, and an insurer cannot be required to provide benefits for risks it did not agree to insure. <u>Waller</u>, 11 Cal. 4th at 16.

Plaintiffs seek damages for installation of a new roof at the Property totaling $104,450. However, the Policy does not provide building coverage for the Property, and even if it did, all experts retained by the parties agree that the roof did not sustain any damage due to Hilary. While the Policy includes coverage for TIBs, it is undisputed that the roof is not an improvement or betterment that was installed at the Property by or on behalf of Plaintiffs and Aladdin's lessor, not Aladdin, is responsible for maintaining the roof.

As a matter of law, AmGUARD is entitled to partial summary judgment as to

Plaintiffs' claim for costs to replace the roof because the roof was not damaged by Hilary and the Policy does not cover loss of or damage to the roof.

**4. The Policy Does Not Cover Costs To Repair The Interior Of The Property**

Plaintiffs claim damages for costs to repair the interior of the Property due to the Loss including costs for demolition of the interior ($138,025), plumbing work ($68,320), electric work ($84,000), mechanical work ($96,280), flooring and base board work ($67,210), drywall and T-bar work ($209,560), furniture and equipment related work ($46,000), rental costs ($20,800) and costs for plans, permits and special inspections ($56,000), overhead and insurance ($71,251.60) and profit ($178,129).

As discussed above, coverage for the Loss is precluded by the Interior Damage Limitation, Deterioration Exclusion, Wear and Tear Exclusion and/or Faulty Maintenance Exclusion, and even if the Loss is covered by the Back Up/Overflow Endorsement, AmGUARD has paid all benefits due under that Endorsement. AmGUARD, as a consequence, is at least entitled to partial summary judgment as to each of these repair costs if the Court declines for some reason to grant summary judgment.

## IV. CONCLUSION

In view of the foregoing, AmGUARD respectfully asks this Court to grant summary judgment in its favor, or alternatively, partial summary judgment as to Plaintiffs' claims as requested in the Notice of Motion.

Dated: October 22, 2026

Respectfully submitted,
WESTON & AGNESS LLP

By: /s/ Shadie Maghareh
Leo L. Ashley III
Shadie Maghareh
Attorneys for Defendant
AMGUARD INSURANCE COMPANY

# PROOF OF SERVICE

I, Regina Macleod, declare:

I am employed in the County of Los Angeles, state of California. I am over the age of 18 and not a party to the within action; my business address is 1960 East Grand Avenue, Suite 811, El Segundo, California 90245.

On October 22, 2026, I served a copy of the following document:

**DEFENDANT AMGUARD INSURANCE COMPANY'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES**

By electronically filing the foregoing document with the Clerk of the United States District Court, Southern District of California, using its ECF system, which electronically notifies the persons on the attached service list at the email addresses registered with the ECF System.

I declare under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on October 22, 2026 at Hawthorne, California.

Regina Macleod

## SERVICE LIST

Emma Van Ginneken
**MORGAN & MORGAN CALIFORNIA LLP**
18100 Von Karman Avenue, Suite 200
Irvine, California 92612
Telephone: (619) 981-0141
Facsimile: (949) 898-6696
E-mail: emma.vanginneken@forthepeople.com
sahar.alfatlawi@forthepeople.com
william.borger@forthepeople.com
colson.houckteal@forthepeople.com

*Attorneys for Plaintiffs,*
Hamdi Abdel Munim Abu Khalaf; and, Aladdin Clairemont & MKT., Inc. dba Aladdin's Cafe

Robert Hamparyan
**HAMPARYAN PERSONAL INJURY LAWYERS SAN DIEGO APC**
275 West Market Street, Suite 1000
San Diego, California 92101
Telephone: (619) 550-1355
Facsimile: (619) 550-1356
E-mail: robert@hamparyanlawfirm.com
matthew@hamparyanlawfirm.com
elizabeth@hamparyanlawfirm.com

*Attorneys for Plaintiffs,*
Hamdi Abdel Munim Abu Khalaf; and, Aladdin Clairemont & MKT., Inc. dba Aladdin's Cafe