WESTON & AGNESS LLP
Leo L. Ashley III (State Bar No. 197890)
Shadie Maghareh (State Bar No. 323670)
1960 East Grand Avenue, Suite 811
El Segundo, California 90245
Telephone:(213) 596-8000
Facsimile: (213) 596-8039
E-mail: lashley@westonagnesslaw.com
smaghareh@westonagnesslaw.com

Attorneys for Defendant
**AMGUARD INSURANCE COMPANY**

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| HAMDI ABDEL MUNIM ABU KHALAF, an individual; and ALADDIN CLAIREMONT & MKT, INC., DBA ALADDIN'S CAFE, a California Corporation;<br><br>Plaintiffs,<br><br>v.<br><br>BERKSHIRE HATHAWAY ASSURANCE CORPORATION, a New York Corporation; BERKSHIRE HATHAWAY GUARD INSURANCE COMPANIES, a Pennsylvania Corporation; BERKSHIRE HATHAWAY INC., a California Corporation; AMGUARD INSURANCE COMPANY, a Pennsylvania Corporation; and DOES 1 through 50, inclusive,<br><br>Defendants. | Case No.: 3:25-cv-02246-H-JLB<br>Assigned to Hon. Marilyn L. Huff<br><br>**DEFENDANT AMGUARD INSURANCE COMPANY'S SEPARATE STATEMENT OF MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**<br><br>[Filed concurrently with AmGUARD's Motion for Summary Judgment, or in the Alternative, Partial Summary Judgment; Declaration of Darren Heiser; Declaration of Shadie Maghareh; and Request for Judicial Notice]<br><br>Date: December 14, 2026<br>Time: 10:30 a.m.<br>Courtroom: 12A<br><br>Action Filed: July 8, 2025<br>Action Removed: August 28, 2025<br>Trial: TBD |

Pursuant to Local Civil Rule 7.1(f), Defendant AmGUARD Insurance Company ("AmGUARD") hereby submits its Separate Statement of Material Facts in support of AmGUARD's Motion for Summary Judgment, or in the Alternative, Partial Summary Judgment ("Motion"), against Plaintiffs Hamdi Abdel Munim Abu Khalaf ("Khalaf") and Aladdin Clairemont & Mkt, Inc., dba Aladdin's Cafe ("Aladdin") (collectively, "Plaintiffs"). As shown below, the following uncontroverted facts support all conclusions of law necessary to dispose of all of Plaintiffs' claims and/or those for which AmGUARD seeks partial summary judgment, which include the following:

1. **AmGUARD is entitled to summary judgment as a matter of law on Plaintiffs' First Cause of Action for Breach of Contract and Second Cause of Action for Breach of the Covenant of Good Faith and Fair Dealing ("Bad Faith") because the evidentiary record discloses three potential causes of the subject Loss, the subject Policy precludes coverage for all three of those causes except for limited coverage for water back-up/overflow loss capped at $10,000 that AmGUARD has already paid, and there is at least a genuine dispute as to whether the Policy covers the Loss.**

2. **In the alternative, AmGUARD is entitled to partial summary judgment as a matter of law on Plaintiffs' First Cause of Action for Breach of Contract because the Policy precludes coverage for the Loss, and even if it does not, AmGUARD has paid all benefits due under the Policy.**

3. **AmGUARD is entitled to partial summary judgment as a matter of law on Plaintiffs' Second Cause of Action for Bad Faith because AmGUARD did not breach the Policy, there is no evidence that AmGUARD unreasonably withheld Policy benefits, and there is at least a genuine dispute as to whether the Policy precludes coverage for the Loss.**

**4. AmGUARD is entitled to partial summary judgment as a matter of law on Plaintiffs' claim for punitive damages because there is no clear and convincing evidence that AmGUARD acted with malice, oppression, or fraud.**

**5. AmGUARD is entitled to partial summary judgment on Khalaf's First Cause of Action for Breach of Contract because he lacks standing.**

**6. AmGUARD is entitled to partial summary judgment on Khalaf's Second Cause of Action for Bad Faith because he lacks standing.**

**7. AmGUARD is entitled to partial summary judgment on Plaintiffs' damages claim for roof repairs to the Property totaling $104,450 because the Policy does not provide coverage for loss of or damage to the roof and AmGUARD has paid any and all Policy benefits that could possibly be due as a result of the Loss.**

**8. AmGUARD is entitled to partial summary judgment on Plaintiffs' damages claim for costs to demolish portions of the Property totaling $138,025 because the Policy precludes coverage for the Loss, and even if it does not, AmGUARD has paid all benefits due under the Policy.**

**9. AmGUARD is entitled to partial summary judgment on Plaintiffs' damages claim for plumbing repairs at the Property totaling $68,320 because the Policy precludes coverage for the Loss, and even if it does not, AmGUARD has paid all benefits due under the Policy.**

///

///

**10. AmGUARD is entitled to partial summary judgment on Plaintiffs' damages claim for electric repairs at the Property totaling $84,000 because the Policy precludes coverage for the Loss, and even if it does not, AmGUARD has paid all benefits due under the Policy.**

**11. AmGUARD is entitled to partial summary judgment on Plaintiffs' damages claim for mechanical repairs at the Property totaling $96,280 because the Policy precludes coverage for the Loss, and even if it does not, AmGUARD has paid all benefits due under the Policy.**

**12. AmGUARD is entitled to partial summary judgment on Plaintiffs' damages claim for flooring and baseboard repairs at the Property totaling $67,210 because the Policy precludes coverage for the Loss, and even if it does not, AmGUARD has paid all benefits due under the Policy.**

**13. AmGUARD is entitled to partial summary judgment on Plaintiffs' damages claim for drywall and T-bar repairs at the Property totaling $209,560 because the Policy precludes coverage for the Loss, and even if it does not, AmGUARD has paid all benefits due under the Policy.**

**14. AmGUARD is entitled to partial summary judgment on Plaintiffs' damages claim for furniture and equipment related repair work at the Property totaling $46,000 because the Policy precludes coverage for the Loss, and even if it does not, AmGUARD has paid all benefits due under the Policy.**

**15. AmGUARD is entitled to partial summary judgment on Plaintiffs' damages claim for rental costs related to repair work at the Property**

**totaling $20,800 because the Policy precludes coverage for the Loss, and even if it does not, AmGUARD has paid all benefits due under the Policy.**

**16. AmGUARD is entitled to partial summary judgment on Plaintiffs' damages claim for plans, permits and special inspections related to repair work at the Property totaling $56,000 because the Policy precludes coverage for the Loss, and even if it does not, AmGUARD has paid all benefits due under the Policy.**

**17. AmGUARD is entitled to partial summary judgment on Plaintiffs' damages claim for overhead and insurance related to repair work at the Property totaling $71,251.60 because the Policy precludes coverage for the Loss, and even if it does not, AmGUARD has paid all benefits due under the Policy.**

**18. AmGUARD is entitled to partial summary judgment on Plaintiffs' damages claim for profit related to repair work at the Property totaling $178,129 because the Policy precludes coverage for the Loss, and even if it does not, AmGUARD has paid all benefits due under the Policy.**

**19. AmGUARD is entitled to partial summary judgment on Plaintiffs' damages claim for loss of business income in May 2025 and April 2026 totaling $89,720 because any such loss was not sustained within twelve consecutive months after the Loss.**

///

///

///

| UNDISPUTED MATERIAL FACTS | SUPPORTING EVIDENCE |
|---|---|
| 1. Defendant AmGUARD Insurance Company ("AmGUARD") issued businessowners policy no. ALBP356464 to Plaintiff Aladdin Clairemont & Mkt, Inc., dba Aladdin's Cafe ("Aladdin"), effective October 1, 2022 to October 1, 2023 (the "Policy"), which provides coverage for the leased business premises located at 5420 Clairemont Mesa Boulevard, San Diego, California 92117 (the "Property"), subject to its terms. | 1. Declaration of Darren Heiser in support of AmGUARD's Motion ("Heiser Decl.") ¶ 5 & Ex. 1 (Policy) at pp. 17-19. |
| 2. The Policy does not provide building coverage for the Property, as no limit of insurance for such coverage is set forth in the Policy's Declarations. | 2. See Heiser Decl., ¶ 5 & Ex. 1 (Policy) at pp. 18-19, 29. |
| 3. The Policy includes coverage for tenant improvements and betterments at the Property ("TIBs") up to a limit of $500,000. | 3. See Heiser Decl., ¶ 5 & Ex. 1 (Policy) at p. 18. |
| 4. The Policy includes coverage for business personal property up to a limit of $500,000. | 4. See Heiser Decl., ¶ 5 & Ex. 1 (Policy) at p. 18. |
| 5. The Policy includes coverage for business income and extra expense for the actual loss sustained up to 12 months, provided such loss occurs within 12 consecutive months after the date of direct physical loss or damage. | 5. See Heiser Decl., ¶ 5 & Ex. 1 (Policy) at pp. 22, 34. |
| 6. The Policy defines TIBs as "… fixtures, alterations, installations or additions: (a) | 6. See Heiser Decl., ¶ 5 & Ex. 1 (Policy) at p. 29. |

| | |
|---|---|
| [M]ade a part of the building or structure you occupy but do not own; and (b) [Y]ou acquired or made at your expense but cannot legally remove …” | |
| 7. Coverage under the Policy is subject to a $1,000 deductible. | 7. See Heiser Decl., ¶ 5 & Ex. 1 (Policy) at p. 18. |
| 8. The Policy provides, in pertinent part, that AmGUARD “… will not pay for loss of or damage to … [T]he interior of any building or structure caused by or resulting from rain …, whether driven by wind or not, unless … [T]he building or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain enters …” (the “Interior Damage Limitation”). | 8. See Heiser Decl., ¶ 6 & Ex. 1 (Policy) at p. 30. |
| 9. The Policy excludes coverage for loss of or damage to property caused by “[R]ust or other corrosion, decay, deterioration …” (the “Deterioration Exclusion”). | 9. See Heiser Decl., ¶ 6 & Ex. 1 (Policy) at pp. 45-46. |
| 10. The Policy excludes coverage for loss of or damage to property caused by “[W]ear and tear …” (the “Wear and Tear Exclusion”). | 10. See Heiser Decl., ¶ 6 & Ex. 1 (Policy) at pp. 45-46. |
| 11. The Policy excludes coverage for loss of or damage to property caused by “[F]aulty, inadequate or defective … [M]aintenance of part or all of any property on or off the | 11. See Heiser Decl., ¶ 6 & Ex. 1 (Policy) at pp. 42, 45, 47. |

| | |
|---|---|
| described premises …" (the "Faulty Maintenance Exclusion"). | |
| 12. The Policy contains a Restaurant Plus Endorsement providing additional coverage for "Water Backup and Sump Overflow" (the "Back Up/Overflow Endorsement"), which covers loss or damage to covered property due to water that "backs up through or overflows or is otherwise discharged from a…drain at your premises… ." | 12. See Heiser Decl., ¶ 5 & Ex. 1 (Policy) at pp. 19, 126-127, 136. |
| 13. The Back Up/Overflow Endorsement limits coverage to $5,000 for covered property and $5,000 for business income and extra expense. | 13. See Heiser Decl., ¶ 5 & Ex. 1 (Policy) at pp. 127, 136-137. |
| 14. Aside from the Back Up/Overflow Endorsement, the Policy excludes coverage for loss or damage caused by "[W]ater that backs up or overflows or is otherwise discharged from a … drain …" (the "Back Up/Overflow Exclusion"). | 14. See Heiser Decl., ¶ 5 & Ex. 1 (Policy) at pp. 42, 44. |
| 15. Khalaf was, at all relevant times, an owner of Aladdin. | 15. See Request for Judicial Notice in support of AmGUARD's Motion ("RJN"), Ex. 20 (Compl.), ¶ 1; Declaration of Shadie Maghareh in support of AmGUARD's Motion ("Maghareh Decl."), ¶ 3 & |

| | |
|---|---|
| | Ex. 14 (Khalaf Dep.) at pp. 53:21-24, 54:23-24. |
| 16. Plaintiffs operate the Property as a Mediterranean restaurant. | 16. See RJN, Ex. 20 (Compl.), ¶ 1; Maghareh Decl., ¶ 3 & Ex. 14 (Khalaf Dep.) at 54:16-18. |
| 17. Khalaf began leasing the Property in or around 1993. | 17. See Heiser Decl., ¶ 10 & Ex. 5 (Lease) at pp. 219, 222; Maghareh Decl., ¶ 3 & Ex. 14 (Khalaf Dep.) at 57:3-4. |
| 18. Aladdin is the current tenant of the Property. | 18. See Heiser Decl., ¶ 10 & Ex. 5 (Lease) at pp. 215-216; Maghareh Decl., ¶ 3 & Ex. 14 (Khalaf Dep.) at 57:17-22. |
| 19. Pursuant to the lease agreement for the Property, the landlord is obligated to maintain the roof, the foundations, and the structural portions of the Property. | 19. See Heiser Decl., ¶ 10 & Ex. 5 (Lease) at p. 228. |
| 20. The Property includes a low-sloped roof enclosed on all four sides by parapet walls, with only one drain (also known as a "scupper") on the back wall. | 20. See Heiser Decl., ¶ 14 & Ex. 8 (Keystone Report) at pp. 281, 294-296; Maghareh Decl., ¶ 6, Ex. 17 (Chilson Dep.) at 237:21-238:23, 278, ¶ 7, |

| | |
|---|---|
| | Ex.18 (Avelar Dep.) at p. 320. |
| 21. In or around 2015, Plaintiffs retained Design Perspectives to provide food service and interior design plans for the remodel of the Property from February through June 2015, and the remodel did not include improvements to the roof of the Property. | 21. See Heiser Decl., ¶ 16 & Ex. 9 (Design Perspectives Letter) at p. 326; Maghareh Decl., ¶ 3 & Ex. 14 (Khalaf Dep.) at p. 57:5-15. |
| 22. Plaintiffs' 2015 remodel of the Property did not include improvements to the roof of the Property. | 22. See Heiser Decl., ¶ 16 & Ex. 9 (Design Perspectives Letter) at p. 326; Maghareh Decl., ¶ 3 & Ex. 14 (Khalaf Dep.) at p. 57:5-15. |
| 23. On February 12, 2023, the interior of the Property sustained water damage due to a rainstorm (the "February Loss"). | 23. See RJN, Ex. 20 (Compl.), ¶ 26 at 10:23-25. |
| 24. Aladdin submitted a claim to AmGUARD regarding the February Loss. | 24. See RJN, Ex. 20 (Compl.), ¶ 28 at 10:28; Maghareh Decl., ¶ 2 & Ex. 13 (Hyre Dep.) at 14:15-15:25. |
| 25. In connection with the February Loss, AmGUARD retained independent adjuster Crawford & Company to inspect the Property and prepare an estimate of costs to repair the damage. | 25. See RJN, Ex. 20 (Compl.), ¶ 31 at 11:4-5; Maghareh Decl., ¶ 2 & Ex. 13 (Hyre Dep.) at pp. 33-36. |
| 26. By letter dated March 22, 2023, in connection with the February Loss, AmGUARD issued a | 26. See RJN, Ex. 20 (Compl.), ¶ 33 at 11:9-11; Maghareh |

| | |
|---|---|
| payment of $3,640.13 for damage to ceiling tiles and floor cleaning in the dishwashing room, dry storage/preparation area, and dining room. | Decl., ¶ 2 & Ex. 13 (Hyre Dep.) at pp. 23:15-24:2, 27:14-28:6, and 37-46. |
| 27. On or about August 20, 2023, rain from Tropical Storm Hilary ("Hilary") entered the Property through the roof and damaged the interior of the building (the "Loss"). | 27. See Heiser Decl., ¶ 3, Ex. 8 (Keystone Report) at pp. 277, 283-284, ¶ 7, Ex. 2 (Claim Notes) at pp. 193-194, ¶ 8, Ex. 3 (Pilot Report) at pp. 199-200; Maghareh Decl., ¶ 6, Ex. 17 (Chilson Dep.) at pp. 277-278; RJN, Ex. 20 (Compl.), ¶ 35 at 11:16-19. |
| 28. Plaintiffs reported the Loss to AmGUARD on August 22, 2023, which was assigned claim No. ALBP356464-002-002-002 ("Claim"). | 28. See Heiser Decl., ¶¶ 3, 7 & Ex. 2 (Claim Notes) at p. 194, ¶ 8, Ex. 3 (Pilot Report) at pp. 199, 204; RJN, Ex. 20 (Compl.), ¶¶ 37-38 at 11:25-12:4. |
| 29. On August 22, 2023, AmGUARD contacted Plaintiffs to begin its investigation of the Claim. | 29. See Heiser Decl., ¶ 7 & Ex. 2 (Claim Notes) at p. 194. |
| 30. AmGUARD retained independent adjuster Pilot Catastrophe Services ("Pilot") to assist in its investigation of the Claim. | 30. See Heiser Decl., ¶ 8 & Ex. 3 (Pilot Report). |

| | |
|---|---|
| 31. On August 28, 2023, in connection with the Claim, Pilot visually inspected the exterior and interior of the Property. | 31. See RJN, Ex. 20 (Compl.), ¶ 40 at 12:7-8; Heiser Decl., ¶ 8 & Ex. 3 (Pilot Report) at pp. 199-201; Maghareh Decl., ¶ 3 & Ex. 14 (Khalaf Dep.) at 65:16-70:21. |
| 32. Pilot did not inspect the roof of the Property on August 28, 2023. | 32. See Maghareh Decl., ¶ 3 & Ex. 14 (Khalaf Dep.) at 66:7-23; Heiser Decl., ¶ 8 & Ex. 3 (Pilot Report) at p. 200. |
| 33. On September 12, 2023, AmGUARD received Pilot's inspection report. | 33. See Heiser Decl., ¶¶ 7, 9 & Ex. 2 (Claim Notes) at p. 193. |
| 34. Pilot's inspection report noted that Pilot observed roof-leak damage to ceiling tiles and grids in the Property's kitchen and two dining rooms and that Pilot did not see any damage to the exterior or interior walls. | 34. See Heiser Decl., ¶ 8 & Ex. 3 (Pilot Report) at p. 200. |
| 35. Pilot prepared an estimate to repair the damage to the ceiling tiles and grids totaling $25,829. | 35. See Heiser Decl., ¶ 8 & Ex. 4 (Pilot Estimate) at pp. 204-211, ¶ 7 & Ex. 2 (Claim Notes) at p. 193. |
| 36. After reviewing Pilot's inspection report on September 12, 2023, AmGUARD's Claim Representative Scott Shaver ("Shaver") entered | 36. See Heiser Decl., ¶¶ 7, 9 & Ex. 2 (Claim Notes) at p. 193. |

| | |
|---|---|
| a claim note stating "[T]here does not appear to be any coverage concerns … ." | |
| 37. After reviewing Pilot's inspection report on September 12, 2023, Shaver caused a payment of $24,829 (net of the Policy's $1,000 deductible) to be issued to Aladdin. | 37. See Heiser Decl., ¶ 9 & Ex. 2 (Claim Notes) at p. 192-193; Maghareh Decl., ¶ 3 & Ex. 14 (Khalaf Dep.) at 76:9-17. |
| 38. On September 14, 2023, AmGUARD received from Pilot copies of Aladdin's lease for the Property and the addendums thereto. | 38. See Heiser Decl., ¶ 10 & Ex. 5 (Lease) at pp. 215-236. |
| 39. On September 19, 2023, Shaver advised Khalaf of the $24,829 payment being issued to Aladdin. | 39. See Heiser Decl., ¶ 11 & Ex. 2 (Claim Notes) at pp. 192-193; Maghareh Decl., ¶ 3 & Ex. 14 (Khalaf Dep.) at 76:9-17. |
| 40. On October 24, 2023, Khalaf advised Shaver that he had obtained a repair estimate for the Property totaling approximately $500,000 and that the restaurant would be closed for seven weeks for repairs. | 40. See Heiser Decl., ¶ 7, Ex. 2 (Claim Notes) at p. 192, ¶ 12, Ex. 7 (BKB Estimate) at pp. 258-270. |
| 41. AmGUARD subsequently received a report from ET&T Indoor Environmental ("ET&T") dated September 11, 2023, describing ET&T's findings following its inspection of the Property including water damage (visible mold growth, water staining, elevated moisture levels in walls, and/or bowing of ceiling tiles) to the | 41. See Heiser Decl., ¶ 7, Ex. 2 (Claim Notes) at p. 191, ¶ 12, Ex. 6 (ET&T Report). |

| | |
|---|---|
| kitchen, bar and cooking station, dining room areas and/or hallway near the bathrooms. | |
| 42. AmGUARD also received a repair estimate prepared by BKB Enterprises, Inc. ("BKB") totaling $495,929.49 for repairs to the Property's interior walls, ceiling, lighting/electrical/HVAC components, flooring, and replacement of an interior cooler/freezer box and the roof. | 42. See Heiser Decl., ¶ 7, Ex. 2 (Claim Notes) at 191, ¶ 12, Ex. 7 (BKB Estimate); RJN, Ex. 20 (Compl.), ¶¶ 45, 47 at 12:18-19, 12:22-23. |
| 43. Shaver conferred with his supervisor Darren Heiser ("Heiser") about the additional documents provided on behalf of Aladdin. | 43. See Heiser Decl., ¶¶ 7, 13 & Ex. 2 (Claim Notes) at pp. 196-197. |
| 44. On November 8, 2023, Heiser entered a claim note describing AmGUARD's plan of action as follows: (1) engage engineering consultant Keystone Experts and Engineers, LLC ("Keystone") to inspect the roof to confirm how the interior water entry occurred and whether said entry resulted from Hilary; (2) contact insured to advise of need to inspect; (3) send a reservation of rights letter regarding coverage concerns; (4) confirm with insured whether there was a complete buildout of the Property, and if so, secure proof of the buildout performed by Aladdin; and (5) proceed with the coverage determination once the engineer's report is received. | 44. See Heiser Decl., ¶¶ 7, 13 & Ex. 2 (Claim Notes) at pp. 196-197. |

| | |
|---|---|
| 45. On November 8, 2023, AmGUARD's Claim Representative Alex Wolfe informed Khalaf of Keystone's assignment and requested documentation to corroborate Aladdin's 2014/2015 buildout of the Property. | 45. See Heiser Decl., ¶¶ 7, 13 & Ex. 2 (Claim Notes) at p. 191. |
| 46. Keystone inspected the Property, including the roof, on November 10, 2023. | 46. See Heiser Decl., ¶ 14 & Ex. 8 (Keystone Report) at pp. 276, 281. |
| 47. Keystone's inspection on November 10, 2023 was performed by licensed engineer Bradley Gerlick ("Gerlick"), who has also been retained as an expert by AmGUARD in this action. | 47. See Maghareh Decl., ¶ 5 & Ex. 16 (Gerlick Dep.) at 210:1-24; Heiser Decl., ¶ 14 & Ex. 8 (Keystone Report) at pp. 276, 320-321. |
| 48. Keystone issued its inspection report dated November 14, 2023, noting the following:<br><br>Keystone inspected the low-sloped roof for physical damage consistent with wind, and did not identify any torn, creased, or detached and displaced modified bitumen sheets caused by wind…<br>* * *<br>The most common mechanism of water intrusion is lack of maintenance and/or deterioration of the roofing system or sealant around windows and doors. Like all building elements, these components have a life expectancy. The roofing system and exterior elements will age and deteriorate over time and eventually fail. Routine maintenance can prolong | 48. See Heiser Decl., ¶ 14 & Ex. 8 (Keystone Report) at pp. 282-284, 290-293. |

| | |
|---|---|
| the usable lifespan and prevent moisture intrusion into the areas that wear out the fastest. This is commonly located at the seals around windows, doors, vents or pipe jacks, or in the sealant used in the flashings around chimneys and other raised areas of the roofing system. UV rays and cycles of thermal expansion and contraction eventually degrade the rubber seals or sealants and cause them to crack and disengage. During a rain event, the resulting cracks and deterioration will allow water to enter into the building… <br> * * * <br> …In the interstitial space above the ceiling, there were numerous areas where the sheathing and framing elements had stains that were dark in color, indicative of long-term water exposure that was inconsistent with wetting due to wind-driven rain during a one-time storm event; This further supported a long-term and ongoing condition of water intrusion through the roof envelope above. On the roof above these areas, there were no displaced and missing roof covering elements due to wind which indicated that ongoing water intrusion was not due to water emanating through a wind-created opening. Rather, there were numerous existing openings including unsealed electrical penetrations, unsealed surface driven fasteners through the modified bitumen on the parapet walls, deteriorated sealant around roof penetrations, deteriorated sealant on the mechanical curbs, deteriorated | |

| | |
|---|---|
| sealant on the parapet walls, and deteriorated underlayment (with exposed roof sheathing); These openings allow for water intrusion in the absence of wind.<br><br>During our inspection, the tenant provided videos showing dripping water from between the ceiling panel seams of the cooler, and extensive water pouring from the ceiling of the food preparation area. These areas were located near an overlying roof vent with a rim that was approximately two inches above the surface of the low-sloped roof. The low-sloped roof was enclosed on all four sides by parapet walls, and there was only one drain on the back parapet wall; This opening is the only opening through which water (that accumulates from the full area of the low-sloped roof) must drain from, and there was ballast on the roof accumulated around this area which obstructs the flow of water resulting in deficient drainage and an accumulation of water. During the passage of Hurricane Hilary, the property was exposed to a prolonged period of extensive rainfall, and water intrusion was due to an accumulation of heavy rainfall that rose to a depth that exceeded the aforementioned roof vent rim, allowing for water to profusely flow through the opening and into the building. | |
| 49. During Keystone's inspection of the Property on November 10, 2023, Gerlick looked for and | 49. See Maghareh Decl., ¶ 5 & Ex. 16 (Gerlick Dep.) at |

| | |
|---|---|
| did not observe any evidence of wind-blown debris lodged in the scupper. | 210:15-212:3, 217:10-218:23. |
| 50. Keystone was not provided with any photographs, video, or other evidence indicating wind-displaced debris was lodged in the scupper at the time of the Loss. | 50. See Maghareh Decl., ¶ 5 & Ex. 16 (Gerlick Dep.) at 212:1-3, 217:10-218:23. |
| 51. Keystone concluded (1) the roof and exterior elements were not damaged or displaced by wind and there was no intrusion through a wind-created opening, and instead, (2) damage to the interior finishes was caused by a combination of (a) long-term water intrusion through existing openings including deteriorated sealant around roof penetrations, deteriorated sealant on the mechanical curbs, deteriorated sealant on the parapet walls and deteriorated underlayment ("Deteriorated Roof Conditions") and (b) heavy rainfall during the one-time storm event that backed up on the roof and overflowed the roof vent. | 51. See Heiser Decl., ¶ 14 & Ex. 8 (Keystone Report) at pp. 284, 296, 298-300. |
| 52. On November 10, 2023, Khalaf provided AmGUARD with the applications and plans concerning the 2015 remodel of the Property. | 52. See Heiser Decl., ¶¶ 7, 15 & Ex. 2 (Claim Note) at p. 190. |
| 53. In response to Khalaf's November 10, 2023 correspondence, AmGUARD inquired about the status of invoices from the contractor who performed the 2015 remodel. | 53. See Heiser Decl., ¶¶ 7, 15 & Ex. 2 (Claim Note) at p. 190. |

| | |
|---|---|
| 54. On November 28, 2023, Khalaf provided AmGUARD with (1) a receipt for health department fees for plan check and permit from the 2015 remodel of the Property, and (2) a letter dated November 27, 2023 from Tony Adamo of Design Perspectives, which confirmed Khalaf contracted with Design Perspectives to provide food service and interior design plans for the remodel of Aladdin's restaurant from February through June of 2015. | 54. See Heiser Decl., ¶¶ 7, 16, Ex. 2 (Claim Note) at p. 190 and Ex. 9 (Design Perspectives Receipt and Letter) at pp. 325-326. |
| 55. The November 27, 2023 letter from Tony Adamo does not indicate remodel work at the Property included improvements to the roof. | 55. See Heiser Decl., ¶¶ 7, 16, Ex. 2 (Claim Note) at p. 190 and Ex. 9 (Design Perspectives Receipt and Letter) at pp. 325-326. |
| 56. Khalaf never advised AmGUARD that Aladdin's improvements and betterments to the Property included the roof. | 56. See Heiser Decl., ¶¶ 7, 16, Ex. 2 (Claim Note) and Ex. 9 (Design Perspectives Receipt and Letter) at pp. 325-326; Maghareh Decl., ¶ 3 & Ex. 14 (Khalaf Dep.) at p. 57:5-15. |
| 57. On January 8, 2024, Khalaf advised Shaver by email that "[A]ll the area that got the water damage was done new 2015." | 57. See Heiser Decl., ¶ 17 & Ex. 10 (Khalaf Email) at p. 328, ¶ 7, Ex. 2 (Claim Notes) at p. 188. |

| | |
|---|---|
| 58. AmGUARD issued a reservation of rights letter to Aladdin on January 9, 2024, advising AmGUARD was in the process of completing its investigation of Policy coverage for the Loss, citing various Policy provisions implicated by the Loss, including, but not limited to, the Deterioration Exclusion, Wear and Tear Exclusion and Faulty Maintenance Exclusion. | 58. See Heiser Decl., ¶ 18 & Ex. 11 (Reservation of Rights Letter) at pp. 331-335, ¶ 7, Ex. 2 (Claim Notes) at p. 188. |
| 59. AmGUARD denied coverage for the Loss by letter to Aladdin dated January 30, 2024, based on Keystone's investigation and conclusions about the cause of the Loss, the Interior Damage Limitation, the Deterioration Exclusion, the Wear and Tear Exclusion, and the Faulty Maintenance Exclusion. | 59. See Heiser Decl., ¶¶ 7, 19, Ex. 12 (Disclaimer Letter) at pp. 338-342; Ex. 2 (Claim Notes) at p. 196; RJN, Ex. 20 (Compl.), ¶ 49 at 13:1-3. |
| 60. During a telephone call on January 30, 2024, Shaver advised Khalaf of (1) the coverage denial, (2) that the initial $24,829 payment had been made "prior to having all of the facts of loss, without properly inspecting the roof …" and (3) that AmGUARD would not request reimbursement of that payment. | 60. See Heiser Decl., ¶¶ 7, 20 & Ex. 2 (Claim Note) at p. 187. |
| 61. Plaintiffs filed this action on July 8, 2025, alleging that AmGUARD wrongfully denied coverage for the Loss and asserting causes of action against AmGUARD for breach of | 61. See RJN, Ex. 20 (Compl.). |

| | |
|---|---|
| contract and bad faith, and seeking compensatory and punitive damages. | |
| 62. On August 1, 2025, Khalaf entered a contract with Sawah Construction Inc. dba 4S Construction ("4S") for construction work at the Property totaling $1,140,025.60 ("Construction Contract"). | 62. See Maghareh Decl., ¶ 3 & Ex. 14 (Khalaf Dep.) at 98:3-99:11, 115-117, ¶ 4, Ex. 15 (Sawah Dep.) at pp. 172:3-17. |
| 63. The Construction Contract describes amounts for replacement of the roof totaling $104,450, as well as repairs to the interior of the Property including demolition of the interior ($138,025), plumbing work ($68,320), electric work ($84,000), mechanical work ($96,280), flooring and baseboard work ($67,210), drywall and T-bar work ($209,560), furniture and equipment related work ($46,000), rental costs ($20,800) and costs for plans, permits and special inspections ($56,000). | 63. See Maghareh Decl., ¶ 3 & Ex. 14 (Khalaf Dep.) at pp. 115-117. |
| 64. The Construction Contract also includes amounts for overhead and insurance ($71,251.60) and profit ($178,129). | 64. See Maghareh Decl., ¶ 3 & Ex. 14 (Khalaf Dep.) at p. 117. |
| 65. Plaintiffs claim the Property was closed in May 2025 and April 2026 for repairs due to Hilary. | 65. See Maghareh Decl., ¶ 8 & Ex. 19 (Pls.' Expert Disclosures) at pp. 369-370. |
| 66. Plaintiffs claim Aladdin allegedly sustained lost profits during the time the Property was | 66. See Maghareh Decl., ¶ 8 & Ex. 19 (Pls.' Expert |

| | |
|---|---|
| closed in May 2025 and April 2026 for repairs due to Hilary totaling $89,720 inclusive of interest. | Disclosures) at pp. 370-371, 373, 376. |
| 67. Plaintiffs retained two experts to opine on the cause of the Loss: general and engineering contractor Shanon Chilson ("Chilson") and structural engineer Eduardo Avelar, P.E., S.E. ("Avelar"). | 67. See Maghareh Decl., ¶ 8, Ex. 19 (Pls.' Expert Disclosures) at pp. 358-361; ¶ 6, Ex. 17 (Chilson Dep.) at pp. 227:12-20, 229:5-13, 230:9-24; ¶ 7, Ex. 18 (Avelar Dep.) at 290:20-291:5, 292:13-15, 295:1-13. |
| 68. Both Chilson and Avelar agree that Hilary did not damage or displace the roof or exterior elements of the Property. | 68. See Maghareh Decl., ¶ 6, Ex. 17 (Chilson Dep.) at pp. 235:19-237:8, 277; ¶ 7, Ex. 18 (Avelar Dep.) at 303:3-13, 321; see also Heiser Decl. ¶ 14, Ex. 8 (Keystone Report) at pp. 281-284. |
| 69. Both Chilson and Avelar agree that, in connection with the Loss, storm water did not enter the Property through a storm-created opening. | 69. See Maghareh Decl. ¶ 6, Ex. 17 (Chilson Dep.) at 235:19-237:8, 243:12-244:13, 277; ¶ 7, Ex. 18 (Avelar Dep.) at 303:21-304:2, 320-321; see also Heiser Decl. ¶ 14, Ex. 8 |

| | |
|---|---|
| | (Keystone Report) at pp. 282-283. |
| 70. Chilson and Avelar do not dispute the existence of the Deteriorated Roof Conditions at the Property. | 70. See Maghareh Decl., ¶ 6, Ex. 17 (Chilson Dep.) at 241:6-23; ¶ 7, Ex. 18 (Avelar Dep.) at 304:14-24, 321; see also Heiser Decl. ¶ 14, Ex. 8 (Keystone Report) at pp. 282-283. |
| 71. Avelar does not dispute the possibility that, in connection with the Loss, storm water entered the Property due to Deteriorated Roof Conditions. | 71. See Maghareh Decl., ¶ 7, Ex. 18 (Avelar Dep.) at 304:14-24. |
| 72. Chilson and Avelar opine that the Loss was caused by water that backed up on the roof and entered the Property through the roof vent(s) and/or mechanical openings due to wind-blown leaves, vegetation, and debris that obstructed the drainage of water through the scupper. | 72. See Maghareh Decl., ¶ 6, Ex. 17 (Chilson Dep.) at 237:21-238:23, 244:3-11, 245:12-246:2, 250:11-252:7, 277-278; ¶ 7, Ex. 18 (Avelar Dep.) at 302:19-24, 304:3-307:22, 320-321. |
| 73. Chilson and Avelar's opinions are based in part on a video depicting water and leaves draining through the scupper and an individual removing leaves and two twigs from the area near the scupper ("Video"). | 73. See Maghareh Decl. ¶ 6, Ex. 17 (Chilson Dep.) at 239:2-15, 245:12-249:1, 250:23-252:4; ¶ 7, Ex. 18 (Avelar Dep.) at 302:14-18, 305:4-307:22, 310:6-311:2. |

| | |
|---|---|
| 74. Neither Chilson nor Avelar conducted any investigation to determine when the Video was actually created. | 74. See Maghareh Decl. ¶ 6, Ex. 17 (Chilson Dep.) at 239:2-15, 245:12-249:1, 250:23-252:4; ¶ 7, Ex. 18 (Avelar Dep.) at 302:14-18, 305:4-307:22. |
| 75. Neither Chilson nor Avelar tested the rate at which water flows through the scupper on the roof of the Property without obstructions. | 75. See Maghareh Decl. ¶ 6, Ex. 17 (Chilson Dep.) at 249:20-250:10, 252:8-254:13; ¶ 7, Ex. 18 (Avelar Dep.) at 299:21-24, 309:6-9. |
| 76. Neither Chilson nor Avelar is able to quantify how much the flow of storm water through the drain on the roof of the Property was impacted by the leaves, vegetation and debris at the time of Loss. | 76. See Maghareh Decl. ¶ 6, Ex. 17 (Chilson Dep.) at 249:20-250:10, 252:8-254:13; ¶ 7, Ex. 18 (Avelar Dep.) at 309:6-9. |

Dated: October 22, 2026

Respectfully submitted,
WESTON & AGNESS LLP

By: **/s/ Shadie Maghareh**
Leo L. Ashley III
Shadie Maghareh
Attorneys for Defendant
AMGUARD INSURANCE COMPANY

**PROOF OF SERVICE**

I, Regina Macleod, declare:

I am employed in the County of Los Angeles, state of California. I am over the age of 18 and not a party to the within action; my business address is 1960 East Grand Avenue, Suite 811, El Segundo, California 90245.

On October 22, 2026, I served a copy of the following document:

**DEFENDANT AMGUARD INSURANCE COMPANY'S SEPARATE STATEMENT OF MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**

By electronically filing the foregoing document with the Clerk of the United States District Court, Southern District of California, using its ECF system, which electronically notifies the persons on the attached service list at the email addresses registered with the ECF System.

I declare under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on October 22, 2026 at Hawthorne, California.

Regina Macleod

# SERVICE LIST

Emma Van Ginneken
**MORGAN & MORGAN CALIFORNIA LLP**
18100 Von Karman Avenue, Suite 200
Irvine, California 92612
Telephone: (619) 981-0141
Facsimile: (949) 898-6696
E-mail: emma.vanginneken@forthepeople.com
sahar.alfatlawi@forthepeople.com
william.borger@forthepeople.com
colson.houckteal@forthepeople.com

*Attorneys for Plaintiffs,*
Hamdi Abdel Munim Abu Khalaf; and, Aladdin Clairemont & MKT., Inc. dba Aladdin's Cafe

Robert Hamparyan
**HAMPARYAN PERSONAL INJURY LAWYERS SAN DIEGO APC**
275 West Market Street, Suite 1000
San Diego, California 92101
Telephone: (619) 550-1355
Facsimile: (619) 550-1356
E-mail: robert@hamparyanlawfirm.com
matthew@hamparyanlawfirm.com
elizabeth@hamparyanlawfirm.com

*Attorneys for Plaintiffs,*
Hamdi Abdel Munim Abu Khalaf; and, Aladdin Clairemont & MKT., Inc. dba Aladdin's Cafe